PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA KENDEL, | ) | CASE NO. 1:10CV02300 |
| | ) | |
| Plaintiff | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| LOCAL 17-A UNITED FOOD AND | ) | |
| COMMERCIAL WORKERS, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** (Resolving ECF Nos. 56, 75 and |
| | | 76) |

## I. INTRODUCTION

Before the Court are Plaintiff Tina Kendel's ("Kendel") Motion for Summary Judgment (as to Defendant's Counterclaim) (ECF No. 75) and Motion to Dismiss Counterclaim (ECF No. 56), and Defendant Local 17-A United Food and Commercial Workers' (referred to as "Local 17A") Motion for Summary Judgment (seeking judgment in its favor on the entire Complaint and judgment in its favor on its own Counterclaim) (ECF No. 59).  After reviewing the motions and the corresponding briefs, the Court grants Kendel's Motion for summary judgment; denies as moot Kendel's motion to dismiss; and denies Local 17-A's motion for summary judgment for the reasons detailed below.

## II. FACTS

### A. The Gender Discrimination Lawsuit

On or about April 1, 1998, Kendel was hired as an Administrative Assistant by Local 17-A, an affiliated Union under the United Food and Commercial Workers ("UFCW") of America. ECF Nos. 59 at 9 and 81 at 7.  Kendel was later promoted to Secretary/Treasurer.  ECF No. 81 at

(5:10CV02300)

7. On August 26, 2009, Kendel filed a Complaint in the United States District Court, Northern District of Ohio under Case Number 5:09 CV 1999, against her employer Local 17-A, and its former President, Mr. Barnes, in his individual and official capacity, along with the International UFCW Union. ECF No. 75-1 at 4. In that case, Kendel asserted claims for gender discrimination and alleged that Barnes repeatedly made derogatory comments about women. ECF No. 81 at 7.

### 1. Un-Redacted Social Security Numbers

After discovery in the gender discrimination lawsuit had concluded, an issue developed as to whether Local 17-A had the requisite number of employees to fall within the purview of Title VII. Defendant filed pleadings indicating that it had only three employees, and therefore was not an employer under the meaning of Title VII. ECF No. 75-1 at 6. In response, Kendel presented documentation to Defendant's counsel negating Defendant's averment, establishing that Local 17-A employed the requisite number of staff. The documents included Local 17 A's payroll records and contained un-redacted security numbers of six of Defendant's employees. ECF No. 75-1 at 6-7.

Although the documents containing the un-redacted social security numbers were never presented during trial as Kendel had intended, Kendel concedes the social security numbers should have been, but were not, redacted before filing the documents which were later placed under seal. ECF No. 77 at 4.

2

(5:10CV02300)

## 2. Conversion Counterclaim

On March 24, 2010, Local 17-A filed a Motion for Leave to Amend its Answer to add a counterclaim alleging conversion in the gender discrimination lawsuit.  (ECF No. 63, Case Number 5:09 CV 1999.)  According to the deposition testimony of Gordon Wise, Former Vice President of Local 17-A, the Conversion Counterclaim was not brought to the Local Board's attention before it was filed.  Wise testified that even Sonja Campbell, President of the local Union, informed him that she was also unaware of why the Counterclaim had been filed and indicated that it might have been filed as a "scare tactic."  ECF No. 73 at 7-9.  He stated that Campbell told him that after Campbell had reviewed the books, she did not find evidence to support the notion that Kendel had embezzeled or converted funds from Local 17-A.  ECF No. 73 at 9.  Campbell testified that soon thereafter, she instructed Local 17-A's Attorney, Brian Zimmerman, to withdraw the Counterclaim and he complied.  ECF No. 61 at 21.

### B.  The Retaliation and Defamation (Instant) Lawsuit

According to Gordon Wise's testimony, criticism of Kendel's discrimination lawsuit was raised during both Executive Board and union membership meetings.  ECF Nos. 81 at 13; 73 at 37.  Wise testified that these meetings often resulted in a "screaming match,"  wherein discussions concerning Kendel's lawsuit were "of a negative nature."  ECF No. 73 at 5-6.  Wise testified that Union members indicated that Kendel was hurting the union by pursuing her rights in the lawsuit.  ECF No. 73 at 20.

3

(5:10CV02300)

President Campbell expressed concern to union members that Kendel's discrimination lawsuit was going to break the union due to the litigation costs and that Kendel was suing individual union members. ECF Nos. 66 at 13, 24-25, 124; 82 at 16; 81 at 17. And, according to Kendel's testimony, Campbell told union members that Kendel was going to take their houses and property. ECF No. 66 at 13-14, 24-25, 124.

Wise also testified that the news of the filing of the Conversion Counterclaim "[spread] like wildfire." ECF No. 73 at 10. He stated that he heard comments from union members that led him to believe that Kendel's reputation was harmed as a result of Local 17-A's filing. ECF No. 73 at 49.

On January 27, 2011, at the conclusion of trial in the gender discrimination lawsuit, a jury rendered a verdict in favor of Local 17-A. Following the trial, Kendel lost her bid for re-election as Secretary/Treasurer. As a result of not being re-elected, Kendel loss a monthly stipend of $100. ECF Nos. 81 at 14; 66 at 83; 82 at 19.

Prior to the gender discrimination lawsuit going to trial, Kendel filed the instant lawsuit alleging retaliation and defamation, as further discussed below.

### III. __PROCEDURAL HISTORY__

On October 8, 2010, Kendel initiated the instant lawsuit and filed an Amended Complaint on August 10, 2011, in the U.S. District Court of the Northern District of Ohio, alleging that Local 17-A retaliated against her after she filed a complaint for gender discrimination with the Ohio Civil Rights Commission and in Federal Court for the previous discrimination lawsuit, as

(5:10CV02300)

discussed above.  Kendel asserts that the retaliatory acts by Defendant include filing the false

Counterclaim, spreading false rumors, intentionally failing to communicate, and campaigning so

that she was not re-elected as Secretary/Treasurer.  In addition, Kendel alleges that Local 17-A

defamed Kendel when it filed the Conversion Counterclaim against her and by spreading false

rumors about her.  ECF No. 81 at 6.  Based upon the foregoing allegations, Kendel asserts three

causes of actions: (1) Retaliation under Title VII, (2) Retaliation under Ohio Revised Code

§4112.02, and (3) a state law claim of Defamation.  ECF No. 54.

On August 22, 2011, Local 17-A filed an Answer and lodged a counterclaim against

Kendel for breach of fiduciary duty based upon its allegation that Kendel copied and removed

Local 17-A's documents, containing un-redacted social security numbers of Local 17-A's

members, and disseminated that information to third parties during the earlier discussed gender

discrimination lawsuit.  ECF No. 55 at 6-7.

On August 23, 2011, Kendel filed a motion to dismiss the Breach of Fiduciary Duty

Counterclaim, and subsequently moved the Court to grant summary judgment for the same claim.

ECF No. 56; ECF No. 75.  On September 15, 2011, Local 17-A filed a motion for summary

judgment, requesting that the Court dismiss all claims against it and grant judgment in favor of

Local 17-A on its counterclaim.  ECF No. 59.

## IV.  STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), the Court must take all well-plead

allegations in the complaint as true and construe those allegations in a light most favorable to the

5

(5:10CV02300)

plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.* at 1950.  Despite the overruling of *Conley v. Gibson*, 355 U.S. 41, 47 (1957), it remains that Fed. R. Civ. P. 8(a)(2), is intended to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

To determine whether a claim should proceed, the Supreme Court has set forth a legal "plausibility standard" to assess whether the facts convincingly suggest actionable conduct, rather than merely describing conduct that actually occurred.  *Twombly*, 550 U.S. at 556 n.3; *see* RAKESH N. KILARU, *The New Rule 12(b)(6): Twombly, Iqbal, and the Paradox of Pleading*, 62 Stan. L. Rev. 905, 910-11 (2010).  Applying this standard, district court judges should weigh the facts and determine, when necessary, whether they are sufficient to "nudge [the] claims across the line from conceivable to plausible" based on their "judicial experience and common sense."  *Twombly*, 550 at 570; *Iqbal*, 129 S. Ct. at 1950.  A suit may proceed as long as plaintiff's complaint crosses that threshold.  *Twombly*, 550 at 570.

6

(5:10CV02300)

Summary judgment is proper if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling* Co., 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## V. **DISCUSSION**

### A. **Retaliation**

Kendel claims she was a victim of retaliation pursuant to Title VII and Ohio Revised Code §4112.02. Both Title VII of the Civil Rights Act ("Title VII") and §4112.02 of the Ohio Revised Code prohibit an employer from discriminating against an employee because the employee has opposed any practice made an unlawful employment practice by Title VII or §4112.02, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII or §4112.02. *See* 42 U.S.C. §

(5:10CV02300)

2000e-3(a); R.C. 4112.02.

A plaintiff may establish a prima facie case of Title VII discrimination through direct or indirect (circumstantial) evidence.  Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).  "At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).

In retaliation claims, under Title VII and Ohio Revised Code §4112.02, supported by circumstantial evidence, the plaintiff bears the burden of proving that "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted); *see also Reid v. Plainsboro Partners, III*, 2010 Ohio 4373, *56 (Ohio Ct. App. 2010).

If the plaintiff can meet this showing, then "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Canitia v.*

8

(5:10CV02300)

*Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If the employer can articulate such a reason, then the plaintiff is required to "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination."  *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).  Although the burden of production shifts between the parties, "the ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 1. *Prima Facie* Case

In the instant case, Local 17-A contends that Kendel has not established a prima facie case of retaliation.  Local 17-A concedes that Kendel engaged in protected activity and that Defendant had knowledge of such activity, as they highlight that the record demonstrates that Sonja Campbell, the President of Local 17-A, accompanied and assisted Kendel in filing her discrimination charges with the Ohio Civil Rights Commission.  ECF No. 59 at 20.  Therefore, Kendel has satisfied the first two prongs of the prima facie case.  However, Local 17-A argues that Kendel cannot demonstrate that she was subjected to adverse employment action as a result of her protected activity because there was no adverse treatment, which is a required showing under the second two prongs.  ECF No. 59 at 22.

In support of its contention that the record lacks indication of adverse treatment, Local 17-A makes the following arguments.  First, Defendant asserts that Kendel's job as the Administrative Assistant for Local 17-A was never affected.  Defendant states: "Her pay,

9

(5:10CV02300)

benefits, duties, hours, and title remained the same. Kendel was never disciplined, never

suspended, and she lost no work from that position. Kendel never complained that anyone had

ever interfered with her job and she continued to perform all of her job responsibilities." ECF

No. 59 at 20-21.

Additionally, Defendant's refute Kendel's averment that Local-17-A's filing of the

Conversion Counterclaim in the original lawsuit constituted an adverse employment action. ECF

No. 59 at 20-21. While the Complaint, as amended, states that Defendant has "[f]iled a false

counterclaim with the Court alleging Plaintiff has 'converted' or 'embezzled' funds from 17-A,"[1]

Defendant avers such argument is belied by the fact that the record indicated that Kendel had

paid herself well in excess of what her written employment contract authorized. Hence, Local

17-A asserts that a true question of fact existed as to whether Kendel converted monies belonging

to Local 17-A, and therefore it cannot be said that the filing of the counterclaim was retaliatory.

ECF No. 59 at 21.

Defendant contends that Kendel's unsuccessful bid for re-election as Secretary/Treasurer

of the Executive Board cannot constitute material adverse action because the record fails to

demonstrate that Defendant was responsible for her defeat. Local 17-A argues "that there is

absolutely no evidence that any Board member, Officer or other Union member did anything to

cause Kendel to lose the election." ECF No. 59 at 23. Specifically, Defendant argues that it is

not unusual for Union members to lose elections. ECF No. 59 at 23. Local 17-A also points to

---

[1] ECF No. 54 at 13.

10

(5:10CV02300)

Kendel's testimony revealing that she did not personally witness her opponent make negative comments about her or her lawsuit during the election.  ECF No. 67 at 78.

As to Kendel's allegation that Defendant was responsible for spreading rumors and invited union members to verbally attack Kendel, and that this alleged conduct constituted a retaliatory act,[2] Local 17-A argues that the record likewise fails to support such a claim. Although Kendel alleges that Defendant made Kendel's gender discrimination lawsuit the subject matter of numerous meetings and encouraged its members to place pressure on Kendel to dismiss the lawsuit,[3] Local 17-A avers that the evidence on the record does not support this assertion. ECF No. 59 at 22-23.  Local 17-A highlights that more than one witness, including Kendel, whom testified that President Campbell sought to prevent discussion of the lawsuit by stating that there existed a "gag" order that prohibited such discussion.  ECF Nos. 62 at 29-30; 67 at 105; 73 at 29.  Moreover, Local 17-A argues that Kendel's own testimony indicates that she invited discussion of her pending lawsuit.  ECF Nos. 59 at 22; 67 at 105, 108-09, 124-25.  Having "invit[e]d discussion of her lawsuit with her fellow Union members[,] she should not now be permitted to complain that those discussions were somehow inappropriate or improper."  ECF No. 59 at 22.

In determining the scope of what constitutes an adverse act, the United States Supreme Court in, *Burlington Northern & Santa Fe Railway Co., v. White*, 548 U.S. 53, (2006), a Title VII

---

[2]  ECF No. 81 at 21.

[3]  ECF No. 81 at 21.

11

(5:10CV02300)

action, held that the application of that statute's retaliation provision is not limited to actions by employers that affect the terms, conditions or status of employment, or even those acts that occur at the workplace. *Burlington Northern*, 548 U.S. at 62-64. Instead, the anti-retaliation provision covers those employer actions that would be seen as materially adverse to a reasonable employee or, in other words, would serve to dissuade a reasonable employee from bringing a charge of discrimination. *Id.* at 68. Furthermore, because the significance of any act must be viewed in the appropriate context, the "legal standard speaks in general terms rather than specific prohibited acts." *Id.* at 69.

In analyzing the evidence in the instant case, the Court finds that Defendant has not met its burden at the summary judgment stage to allow the Court to conclude, as a matter of law that the acts alleged to be taken against Kendel were not materially adverse.

### a. Adverse Action Not Effecting Kendel's Job

Defendant's argument that Kendel cannot make a showing that she suffered adverse treatment because her position as an Administrative Assistant was not affected lacks merit. Unlike the original claim of gender discrimination, actionable retaliation is not limited only to adverse changes in the employment relationship, such as reductions in pay or termination. Rather, any non-employment retaliation reasonably likely to deter protected activity may constitute proscribed retaliation. *See Burlington Northern*, 548 U.S. at 62-68.

### b. Conversion Counterclaim

Concerning Defendant's argument that the filing of the Conversion Counterclaim fails to

12

(5:10CV02300)

amount to an adverse action, the Court notes that both the Ohio Supreme Court and a federal court within this Circuit have recognized that "the filing of a lawsuit or a counterclaim can constitute an adverse employment action." *Greer-Burger v. Temesi*, 116 Ohio St. 3d 324, 327 (Ohio 2007); *see also Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1009 (S.D. Ohio 2002) ("This Court concludes that the adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee."); *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F. Supp. 2d 756, 761 (N.D. Ohio 1999) (rejecting the defendant's argument that a counterclaim could not be considered an adverse employment action and allowing the EEOC to proceed with a suit premised on said counterclaim). Although "an employer is not barred from filing a well-grounded, objectively based action against an employee who has engaged in a protected activity,"[4] the filing of a lawsuit not in good faith and instead motivated by retaliation can be actionable under Title VII and under Ohio law. *See Outback Steakhouse*, 75 F. Supp. 2d 758-59; *Gliatta*, 211 F. Supp. 2d at 1009.

In the instant case, there exists a genuine issue of material fact as to whether Local 17-A's Conversion Counterclaim was well grounded and not filed in bad faith. The Court's conclusion is based primarily upon Gordon Wise's sworn testimony that Campbell not only indicated that the Counterclaim may have been lodged against Kendel as a "scare tactic," but also indicated that she failed to find evidence to support a claim of conversion.[5] *ECF No. 73 at 8-9*. Additionally,

---

[4] *Greer-Burger*, 116 Ohio St. 3d at 324.

[5] As its President, Campbell's statements would be nonhearsay and admissible under Federal Rule of Evidence 801(d)(2)(D) ("a statement by the party's agent or servant concerning a

(5:10CV02300)

Wise's testimony is corroborated by the lack of any issue concerning Kendel embezzling funds raised by the audits mandated by Local 17-A's Audit Committee that reviews all of the books on a quarterly basis for accuracy of pay and other disbursements.  ECF Nos. 81 at 12; 61 at 18.  Also worthy of suspicious is the summary withdrawal of the Counterclaim.  ECF No. 81 at 10.  While Defendant avers that its withdrawal was based upon a concern that the International Union would "trustee" 17-A if the conversion charges were proven to be true,[6] a reasonable juror could disagree and find such an explanation a mere cover-up, and judge the true reason for the claim's withdrawal was that it had been filed in bad faith.

### c.  Election Loss

With respect to Defendant's argument that Kendel's loss of the election cannot constitute an adverse action, the Court is unsure whether Kendel offers this argument.  It appears that Kendel alleges that her loss of the election was the product of Defendant's alleged retaliatory actions, not a retaliatory act in and of itself.  The conduct that purportedly led to Kendel losing the election involved Defendant spreading false rumors and inviting union members to verbally attack Kendel.  ECF No. 81 at 27.  Thus, the Court turns its attention to addressing whether either allegation rises to the level of being truly adverse, as discussed below.

### d.  Allegation that Defendant Invited Union Members to Verbally Attack Kendel

matter within the scope of the agency or employment, made during the existence of the relationship").

[6]  ECF No. 82 at 10.

14

(5:10CV02300)

As a preliminary matter, the Court notes that there is a genuine issue of material fact as to whether Defendant invited union members to verbally attack Kendel.  Defendant responds to Kendel's allegation by denying that it was involved in such conduct and, instead, points the finger at Kendel by stating that "she openly and voluntarily raised the subject of her pending lawsuit and invited discussion of the same.  ECF No. 59 at 22.  Kendel, however, refutes this point, as discussed above.  ECF No. 81 at 13, n.31.  Her sworn deposition testimony reveals that she allegedly offered to discuss her lawsuit only in response to criticisms being raised as a means to defend her reputation.  ECF Nos. 81 at 13; 67 at 123-124.

Kendel also places the blame for these "attacks" at the hands of Campbell.  Kendel avers that it was Campbell's duty–as President of Local 17-A–to control the membership meetings, yet she allowed the attacks to continue.  Moreover, Kendel states that when she would start to defend herself, Campbell would cut the meeting off, ending the discussion was over.  ECF Nos. 81 at 13; 66 at 34-35; 67 at 123-24.

While the "attacks" allegedly emanated mostly from Kendel's co-workers, the Sixth Circuit allows for employer liability to attach in circumstances where "supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008).  Thus, Local 17-A could be liable for its inaction.  However, the question remains whether Defendant's conduct rises to the level of an adverse employment action.

The Supreme Court has limited "adverse employment actions" to something more than

15

(5:10CV02300)

"petty slights, minor annoyances, and simple lack of good manners." *Burlington Northern*, 548 U.S. at 68.  And the Sixth Circuit has stated that "de minimis employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

    As is the nature of our adversarial system, one could argue that the Defendant's purported actions are nothing more than "petty slights" that fail to meet the adverse employment action threshold.  *See Mory v. City of Chula Vista*, 2008 U.S. Dist. LEXIS 9911 (S.D. Cal. 2008) (finding that union members objections within the union meeting regarding the use of funds towards a lawsuit were trivial harms and not materially adverse).  Taking the facts in the light most favorable to the non-moving party, however, the Court concludes that Kendel has presented sufficient evidence to establish that permitting the verbal attacks against Kendel rise to the level of adverse action because a reasonable fact finder could find that, having done, Defendant could dissuade Kendel from bringing a charge of discrimination.  *See Burlington Northern*, 548 U.S. at 68.  This is punctuated by Wise's testimony that the meetings erupted in screaming matches, wherein people accused Kendel of initiating the lawsuit as a means to gain money.  ECF Nos. 81 at 13, 73 at 5-6, 31.

    Additionally, it is also plausible that Defendant's alleged conduct attributed to Kendel's loss of the election, which had an adverse impact on Kendel's wages.  *See Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) (finding that a "denial of money" qualified as a materially adverse action in a Title VII retaliation case); *Harris v. Butler County*, 344 Fed. Appx. 195, 199 (6th Cir. 2009) (finding that plaintiff's delay in receiving his special commission did

16

(5:10CV02300)

not constitute a material adverse employment action because it did not produce a direct effect on

plaintiff's level of pay); *Kyle-Eiland v. Neff, 408 Fed. Appx.* 933, 941 (6th Cir. 2011) (noting that

a negative performance evaluation does not constitute an adverse employment action, unless the

evaluation has an adverse impact on an employee's wages or salary, and finding that a negative

performance evaluation may rise to the level of an adverse action if the employee can point to a

tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because

of the downgraded evaluation).

### e. Allegation that Defendant Spread False Rumors

With the exception of the allegation concerning the filing of the Counterclaim, which the

Court has already discussed, the Court finds that there is little evidence supporting that

Defendant was responsible for spreading false rumors.  Kendel points to Former Vice President

of the Executive Board,[7] Anthony Findlay's testimony indicating that Campbell and other union

members encouraged people not to vote for Kendel, and that various union members spread the

false rumor that Kendel was going to break the union.  However, as highlighted by Defendant,

Findlay's testimony is based entirely upon inadmissible hearsay that cannot be considered on a

motion for summary judgment.  *See Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603,

620 (6th Cir. 2003).

Kendel also points to additional alleged "untruthful" statements circulated by Defendant.

She avers that Campbell made the false statement that Kendel was suing individual members and

---

[7] ECF No. 59 at 14.

(5:10CV02300)

that Kendel was going to take their houses and property. ECF No. 66 at 13-14, 24-25, 124.

With respect to these statements, Defendant argues that Campbell's statement were true, given

that Kendel had originally named John Doe Defendants in the instant litigation, who were

allegedly identified as individual union members. ECF Nos. 82 at 16; 66 at 24; 1.

The truth of the alleged rumors are less important to the Court's determination of whether

Kendel has made a *prima facie* case of retaliation than whether a reasonable jurist could find that

the alleged rumors could dissuade a reasonable employee from bringing a charge of

discrimination. *See* *Burlington Northern*, 548 U.S. at 68. Regarding the latter, the Court

concludes that the answer is yes, at least when one looks at the totality of the Defendant's alleged

campaign against Kendel. Additionally, given that Defendant has not disputed whether there

was a causal connection between the protected activity and the alleged adverse employment

action–prong four of the *prima face* case–the Court concludes that Kendel has met her burden of

establishing a *prima facie* case of retaliation.

## 2. Legitimate Non-Discriminatory Reason and Pretext

To survive a motion for summary judgment, a plaintiff must ultimately prove that the

employer took the adverse action because the plaintiff exercised a protected right, and not

because of some legitimate, non-discriminatory reason. *Edgar v. JAC Products, Inc.*, 443 F.3d

501, 509 (6th Cir. 2006). Although Local 17-A proffers several legitimate non-retaliatory

reasons for its actions, including its reasons for filing the Conversion Counterclaim, when the

Court views the facts in light most favorable to the non-moving party, the Court finds that

Kendel has established a genuine factual dispute as to whether Local 17-A alleged actions were

18

(5:10CV02300)

in retaliation for her exercising her protected right, that is filing a gender discrimination lawsuit.

Local 17-A's motion for summary judgment in its favor with respect to this claim is denied.

### B.  Defamation

Kendel claims that Local 17-A defamed her by filing (in the gender discrimination

lawsuit) the Conversion Counterclaim alleging theft.  In its Motion for Leave to Amend its

Answer, Local 17-A's stated: "Plaintiff Tina Kendel, while in the course and scope of her

employment with Defendant Local 17-A, was actively engaged in the embezzlement/conversion

of money from her employer."  ECF No. 63-1 at 4 for Case No. 5:09-cv-01999.  Kendel also

claims that she was defamed when Defendant spread the following "false rumors about her:"

Kendel was going to break the union, Kendel was suing individual union members, and Kendel

was going to take their houses and property.  ECF No. 81 at 6, 23.  Defendant has moved for

summary judgment on this claim based upon the argument that the statements contained in the

Counterclaim are absolutely privileged, and that Kendel is unable to prove that these statements

along with the alleged rumors are either defamatory or untrue.  ECF Nos. 59 at 24-26; 82 at 20-

21.

Under Ohio law, a plaintiff asserting a defamation claim must allege (1) a false and

defamatory statement concerning another; (2) an unprivileged publication to a third party; (3)

fault amounting at least to negligence on the part of the publisher, (4) either actionability of the

statement irrespective of special harm or the existence of special harm caused by the publication.

See *Fitzgerald v. Roadway Express, Inc.*, 262 F. Supp.2d 849 (N.D. Ohio 2003) (citing

*Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Servs., Inc.*, 81 Ohio App.3d 591, 611 N.E.2d

19

(5:10CV02300)

955 (1992)).

Defamation falls into two categories, defamation *per quod* or *per se*. *See McCartney v. Oblates of St. Francis deSales*, 80 Ohio App. 3d 345, 353 (1992). In defamation *per quod*, a publication is merely capable of being interpreted as defamatory, and the plaintiff must allege and prove damages. *See Dodley v. Budget Car Sales, Inc.*, 1999 Ohio App. LEXIS 1790 (Ohio Ct. App.1999). Defamation *per se* occurs if a statement, on its face, is defamatory. *See Moore v. P.W. Publishing Co.*, 209 N.E.2d 412, 415 (Ohio 1965). Additionally, "[w]hen a statement is defamatory *per se*, a plaintiff 'may maintain an action for [defamation] and recover damages, without pleading or proving special damages.'" *Wagner v. Circle W Mastiffs*, 732 F. Supp. 2d 792, 805 (S.D. Ohio 2010) (citing *Becker v. Toulmin*, 138 N.E.2d 391, 395 (Ohio 1956)). Damages are presumed. *See Wagner*, 732 F. Supp. 2d at 805 (citing *Wampler v. Higgins*, 752 N.E.2d 962, 977 n.8 (Ohio 2001)).

In order to be actionable *per se*, the allegedly defamatory statement must fit within one of four classes: (1) the words import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the words impute some offensive or contagious disease calculated to deprive a person of society; (3) the words tend to injure a person in his trade or occupation; and (4) the words tend to subject a person to public hatred, ridicule, or contempt. *See Am. Chem. Soc. v. Leadscope*, 2010 Ohio 2725, 2010 WL 2396544, *12 (Ohio Ct. App. 2010).

## 1. Conversion Counterclaim

Statements made during a judicial or quasi-judicial proceeding are absolutely privileged against a claim for defamation "as long as the allegedly defamatory statement is *reasonably*

20

(5:10CV02300)

*related* to the proceeding in which it appears." *Hecht v. Levin*, 66 Ohio St.3d 458, 460 (1993)

(citations omitted and emphasis added).  Because the Conversion Counterclaim was reasonably

related to Kendel's "original" and separately filed, *i.e.* gender discrimination claims against Local

17-A, Defendant Local 17-A contends that it is entitled to absolute immunity as a defense against

Kendel's defamation claim based upon the statements in the counterclaim alleging theft.  In

support of this contention, Defendant makes two arguments.  First, Defendant asserts that the

allegations set forth in the subject pleading relate directly to Kendel's employment and

credibility.  Defendant states that during the pendency of the gender discrimination lawsuit

"Plaintiff Kendel's credibility was obviously an issue and if it could be demonstrated that she had

been converting funds, that evidence would also be directly related to her credibility."[8] ECF No.

82 at 21.  Additionally, Defendant argues that the evidence that supported the filing of the

proposed Counterclaim was discovered during the pendency of Kendel's gender discrimination

lawsuit.  ECF Nos. 59 at 25; 82 at 20-21.  Kendel responds that "Defendant's conversion

counterclaim [was] not even remotely related to Plaintiff's gender discrimination claim.  ECF

No. 81 at 23.  The Court agrees.  The Court finds that Defendant's argument lacks merit.

The connection between the allegations of discrimination based upon gender and the

counterclaim of theft is too tenuous to be described as "reasonable."  While "the truth of an

alleged defamatory pleading is not relevant in the determination of whether the doctrine of

---

[8] There are several ways of discrediting an opponent at trial.  Filing a specious and
summarily withdrawn counterclaim, the content of which could be easily argued to be highly
inflammatory and unfairly prejudicial, is not among those recommended by the undersigned.

(5:10CV02300)

absolute privilege should apply in a given case," *see Surace v. Wuliger*, 25 Ohio St. 3d 229, 235 (Ohio 1986) (citing *Erie County Farmers' Ins. Co. v. Crecelius*, 122 Ohio St. 210, 213-14 (Ohio 1930), whether the statement is reasonably related to the proceeding in which it appears is of paramount importance.  In this case, the Court finds no relatedness–reasonable or otherwise. Therefore, the defense of absolute privilege alleged by Defendant does not apply to the defamation allegation.

### 2.  Statement: Kendel Was Suing Individual Union Members

Defendant avers that Campbell's statement that Kendel was suing individual members cannot constitute a basis for defamation because the statement was true.  ECF No. 82 at 21.  The Court agrees.  "[T]ruth is a complete defense [to defamation]  even if the words could be construed as defamatory." *Bukowski v. Hall*, 165 F. Supp. 2d 674, 679 (N.D. Ohio 2001) (citing *Kilroy v. Lebanon Correctional Inst.*, 575 N.E.2d 903, 906 (Ohio Ct. Cl.1991).  In order for a statement to be true under Ohio law, a party need only show that the statement is "substantially true." *Id*.  Here, the statement is true as evidenced by the inclusion of the John Doe Defendant union members.  Thus, even if the statement could be construed as defamatory, its truth defense prevents it from being actionable.  Accordingly, the Court concludes that the above statement does not provide a basis for Kendel's defamation claim.

### 3.  Statements: Kendel Was Going to Take Individual Union Members' Houses and Property & Kendel Was Going to Break the Union

Defendant argues that Campbell's alleged statement that Kendel was going to break the Union cannot be held defamatory as "President Campbell had the right and the obligation

(5:10CV02300)

to inform the Board for Local 17-A of its financial costs associated with Plaintiff

Kendel's litigation." ECF No. 82 at 21.  Defendant further states that it was no secret that there

was no insurance coverage and that Local 17-A was paying for all litigation expenses out of its

own bank account.  Concerning Kendel's allegation that Campbell made the statement to union

members that Kendel was going to take their houses and properties as a result of the

discrimination lawsuit, Defendant fails to offer a response.

Defendant does not expressly argue the truthfulness of these claims.[9]  Without the defense

of truth, the question remains whether either statement could be categorized as defamatory.

Pursuant to Ohio Law, words are defamatory when the "statements reflect upon a

person's character in a manner that will cause him to be ridiculed, hated, or held in contempt, or

in a manner that will injure him in his trade or profession." *Earp v. Kent State Univ.*, 2010 Ohio

5904, P12 (Ohio Ct. Cl. 2010) (citing *Matikas v. Univ. of Dayton*, 152 Ohio App. 3d 514 (Ohio

Ct. App. 2003).

Moreover, summary judgment is appropriate only if "reasonable minds can come to but

one conclusion when viewing the evidence in favor of the nonmoving party, and that conclusion

is adverse to the nonmoving party." *See Shoemaker v. Cmty. Action Org. of Scioto County, Inc.*,

2007 Ohio 3708, P10 (Ohio Ct. App. 2007).

---

[9] The Court notes that there is evidence contradicting Defendant's assertion that Local 17-A lacked insurance coverage.  Kendel avers that Local 17-A held insurance coverage for the lawsuit.  ECF No. 81 at 16, n.45.  And the Court takes judicial notice of Case No. 5:11-cv-02495, wherein Local 17-A is suing its insurance provider for failing to reimburse the union for litigation expenses involving Kendel's discrimination lawsuit.

(5:10CV02300)

In the instant case, the Court concludes that a reasonable mind could find that the aforementioned statements caused injury to Kendel's reputation, as alleged, given that the record provides some evidentiary basis for Kendel's assertion.  *See Shoemaker*, 2007 Ohio 3708, *P14 ("[D]efendants were not entitled to judgment because [plaintiff] presented evidence that the communications were injurious to his employment.  Thus, they amounted to defamation *per se* for purposes of summary judgment.").  While much of Kendel's evidence is inadmissable hearsay, the testimony of Gordon Wise, Vice President of Local 17-A, alone, could be sufficient to persuade a reasonable juror that Defendant's comments were injurious to Kendel's employment.  As indicated previously, Wise testified that the membership meetings often erupted in screaming matches.  ECF No. 73 at 5-6.  He also indicated that in one of the meetings, persons were yelling to Kendel: "You just want money" and "Is that all you want is money." ECF No. 73 at 31.  Additionally, Kendel's testimony provides further support that said comments could have been injurious to her employment, and specifically could have led to her loss of her position as Secretary/Treasure in the election.  She states that one union member, Frank Mills, informed her that he did not vote for her because he did not like her lawsuit.  ECF No. 66 at 41.

Accordingly, the Court concludes that summary judgment is not appropriate with respect to Kendel's defamation claim based upon the statements that Kendel was going to (1) take individual union members' houses and property and (2) break the union.

### C.  Breach of Fiduciary Duty Counterclaim

Local 17-A alleges that Kendel breached her fiduciary duty to Local 17-A when she removed un-redacted social security numbers from its offices without authorization during the

24

(5:10CV02300)

pendency of the gender discrimination lawsuit.

Pursuant to Ohio law, the elements of a breach of fiduciary duty claim are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Camp St. Marys Ass'n of the W. Ohio Conf. of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio App. 3d 54, 68 (Ohio Ct. App. 2008) (citations omitted).

Kendel avers that the claim requires dismissal for several reasons:  (1) Defendants have failed to establish that Kendel was an employee who owed any fiduciary duty (ECF Nos. 75-1 at 11-12;77 at 5-6); (2) Defendant failed to plead damages with particularity (ECF Nos. 75-1 at 14). (3) Kendel's purported conduct–misappropriating social security numbers and other private identifying information provided by employees–could not have breached any fiduciary duty as a matter of law (ECF No. 75-1 at 9-10).  Additionally, Kendel avers that the claim should be dismissed because Defendant has failed to satisfy both constitutional and prudential standing limitations.  ECF No. 75-1 at 13-14.

The Court finds that, minimally, Kendel has presented one meritorious argument entitling Plaintiff to summary judgment in its favor regarding the counterclaim.  Local 17-A lacks constitutional standing to bring this action because Defendant has failed to allege or establish that it suffered an injury-in-fact that was either "actual or imminent."

It is well settled that one of the requirements of standing is that the party must have suffered an injury in fact, defined as an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not hypothetical or conjectural.  *See Lujan v.*

25

(5:10CV02300)

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  And a party lacks standing when the alleged

injury is dependent upon the perceived risk of future actions of third parties not before the Court.

*See Id*. at 564 (stating that plaintiff alleging a future injury at some indefinite time does not

support a finding of an "actual or imminent injury").

 In the identity theft context, wherein parties make allegations concerning the

misappropriation of personal and sensitive information, "courts have embraced the general rule

that an alleged increase in risk of future injury is not an 'actual or imminent' injury.

Consequently, courts have held that plaintiffs do not have standing . . . in cases involving identity

theft or claims of negligence and breach of confidentiality brought in response to a third party

theft or unlawful access to financial information . . ." *Key v. DSW, Inc.*, 454 F. Supp. 2d 684,

689 (S.D. Ohio 2006); *see also Giordano v. Wachovia Sec.*, 2006 U.S. Dist. Lexis 52266 (D.N.J.

2006); *Forbes v. Wells Fargo* 420 F. Supp. 2d 1018 (D. Minn. 2006); *Guin v. Brazos Higher*

*Educ. Serv. Corp., Inc.*, 2006 U.S. Dist. Lexis 4846 (D. Minn. 2006); *Stollenwerk v. Tri-West*

*Healthcare Alliance*, 2005 U.S. Dist. Lexis 41054 (D. Ariz. 2005).

 In the instant case, the only injury[10] that Local 17-A claims to have incurred as a result of

Kendel's unauthorized removal of documents, which contained its members' social security

numbers is that "Local 17-A will need to contact by letter each Union member affected by the

release of their social security numbers." ECF No. 76 at 3.  However, this alleged injury does not

---

 [10]  Defendant's Answer states that " [a]s a direct and proximate result of the
aforementioned breach of duty and fiduciary relationship, Defendant Local 17-A has suffered
damages and will continue to suffer damages." ECF No. 55 at 7.

26

(5:10CV02300)

rise to the level of creating a concrete and particularized injury.  Defendant overlooks the fact that

its claimed potential expenditure, "was not the result of any present injury, but rather the

anticipation of future injury that has not materialized.  In other words, [Local 17-A's alleged]

injuries are solely the result of a perceived risk of future harm." *Forbes*, 420 F. Supp. 2d at 1021.

Accordingly, the Court finds that Local 17-A has shown no present injury or reasonably certain

future injury to satisfy the standing threshold.[11]  Therefore, summary judgment in favor of Kendel

on the Counterclaim is granted.

## VI.  CONCLUSION

For the reasons stated above, the Court grants summary judgment in favor of Kendel on

Defendant's Counterclaim (ECF No. 75); denies as moot Kendel's motion to dismiss (ECF No.

56); and denies Local 17-A's motion for summary judgment in its entirety (ECF No. 59).

IT IS SO ORDERED.


December 5, 2011                                          */s/ Benita Y. Pearson*
Date                                                         Benita Y. Pearson
                                                             United States District Judge

_____

[11]  The Court also notes Local 17-A's failure to establish that it suffered an injury-in-fact
as a result of Kendel's purported conduct also precludes it from satisfying the last element within
a claim for breach of fiduciary duty, which likewise requires a showing of an injury.  *See Camp
St. Marys Ass'n*, 176 Ohio App. 3d at 68; *see also Ruiz v. Gap, Inc.*, 622 F. Supp. 2d 908, 918
(N.D. Cal. 2009) (finding claim for fear of future identity theft must be dismissed for lack of
actual damages); *see also In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010
U.S. Dist. Lexis 87409, *24-25 (W.D. Ky. 2010) ("Other courts have held that while a plaintiff
may have standing, claims for fear of future identity theft must be dismissed for lack of actual
damages.").